IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

SHERRY LEE TYSON,

                      Plaintiff,                  OPINION AND ORDER

    v.

                                              08-cv-383-bbc

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                    Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

       This is an action for judicial review of an adverse decision of the Commissioner of

Social Security brought pursuant to 42 U.S.C. § 405(g).  Plaintiff Sherry Lee Tyson, who

suffers from recurrent, severe headaches, seeks reversal of the commissioner's decision that

she is not disabled and ineligible for Disability Insurance Benefits under Title II of the Social

Security Act, codified at 42 U.S.C. §§ 416(i) and 423(d).  Plaintiff contends that the

decision denying her claim is not supported by substantial evidence because the

administrative law judge made a number of unfounded assumptions about the medical

evidence and made an erroneous credibility determination in concluding that she was able

to perform medium work on a consistent, full time basis.   In addition, she contends the

administrative law judge erred in finding that she did not have an impairment that met or

1

equaled a listed impairment.  I find that the administrative law judge did not err in finding that plaintiff's impairments did not meet or equal a listing but did commit a number of logical errors in finding that plaintiff retained the residual functional capacity to work on a consistent and regular basis.  Because I am not persuaded that the outcome would be the same without these errors, I am remanding this case to the commissioner for further proceedings.

The following facts are drawn from the administrative record (AR):

FACTS

A.  Background and Medical Evidence

Plaintiff was born on March 14, 1964.  AR 796.  She graduated from high school, AR 797, and her past work includes work as a sales department supervisor, bookkeeper, assistant manager and office assistant.  AR 134.  Plaintiff applied for Social Security Disability Insurance Benefits on February 9, 2005, alleging that she had been unable to work since January 1, 2002 because of headaches.  AR 26, 77-79 and 101.  The last date on which she was insured for disability insurance benefits was September 30, 2005.  AR 26.

1.  Records prior to last insured date, September 30, 2005

Plaintiff has suffered from headaches since she was 19 years old.  In 2002 and 2003, her headaches became more frequent and more severe.  Her treating physician, Georgia Brunette, D.O., prescribed medication, including Imitrex (a commonly-prescribed migraine drug that reduces pain by constricting blood vessels) and Lortab (a combination of acetaminophen and hydrocodone).  When those medications failed to work, plaintiff sought treatment in the emergency room at St. Mary's Hospital in Superior, Wisconsin, where she was typically treated with a combination of Demerol (a narcotic opiate) and anti-nausea drugs.

On January 6, 2004, plaintiff saw Brunette for a severe headache that had not relented in spite of an Imitrex injection.  Plaintiff asked whether she could get an injection of Demerol, noting that she had received good benefits from it in the past in the emergency room.  She also asked whether there were other medications she could try for her headaches. Brunette reported that plaintiff was holding her head because of the pain and was sensitive to light.  Brunette prescribed additional medications (Zomig and Cardizem) and referred plaintiff to a neurologist.  She recommended that plaintiff discontinue the Imitrex injections because plaintiff reported that it made her body feel "like lead."  After seeing Brunette, plaintiff was wheeled to the emergency room for an injection of narcotics.  AR 290.

3

Plaintiff was seen by neurologist Dr. David L. Camenga on January 21, 2004.  He noted that the Cardizem prescribed by Brunette appeared to be helping plaintiff's headaches. Camenga recommended that plaintiff resume the Imitrex injections because plaintiff said they had been effective in interrupting her headaches.   In addition, he prescribed hydrocodone and an anti-nausea medication.  AR 285, 287.

Plaintiff returned to see Camenga on February 18, 2004.  He noted that plaintiff had had only one breakthrough migraine headache requiring emergency room treatment  since starting her new medications.  Camenga increased her dosage of Cardizem.  AR 282-83.

Plaintiff saw Brunette on April 29 and May 5, 2004 for medication monitoring. AR 260-62, 267-68.  On April 29, plaintiff reported that although the Cardizem had helped her headaches, she had stopped taking it because it was causing shortness of breath and swelling in her fingers and legs.  AR 267.  Brunette prescribed Atenolol to replace the Cardizem.  AR 269.  However, on May 5, she changed plaintiff back to a lower dosage of Cardizem after plaintiff reported that she had experienced extra or skipped heartbeats on the Atenolol.  AR 260-62.  Holter monitoring was normal.  AR 259.

Between May 6 and July 4, 2004, plaintiff went to the emergency room four times seeking treatment for her migraines.  On each occasion, she was given an injection of Demerol and Vistaril.  AR 255-58, 250-51, 248-49.

At a visit with Camenga on July 7, 2004, plaintiff asked whether there was something she could take instead of the Cardizem, which she had stopped taking because she was no longer receiving any benefit from it.  Camenga prescribed Depakote.  AR 247.  When plaintiff returned to see Camenga on August 4, 2004, she reported feeling so good that she had gone camping with her children.  AR 242.  Plaintiff did not have any emergency room visits for headaches between July 24 and August 29, 2004, and again from August 29 to November 2, 2004.  On November 4, 2004, she told Brunette during her annual physical exam that the headaches were much less frequent since she had been taking Depakote and that she was tolerating the medication well.  AR 225.

From November 17 to December 14, 2004, however, plaintiff had three emergency room visits for migraines and was treated with Demerol, Vistaril and sometimes Toradol (a nonsteroidal anti-inflammatory).  On December 16, 2004, plaintiff returned to see Camenga, who prescribed Topamax, a new anti-migraine drug, for her increased headaches.  AR 211. On January 5, 2005, plaintiff was seen at the emergency room for complaints of low back pain, a bad taste in her mouth and a feeling of being unable to urinate, all of which she attributed to the Topamax.  The treating physician found nothing abnormal and advised plaintiff to reduce her water intake.  AR 321-22.

On February 2, 2005, plaintiff saw Camenga, who noted that plaintiff had been in the emergency room frequently with headaches and complaints of medication side effects.

5

Plaintiff told Camenga that she had been having two to three migraine episodes a month and that she had stopped taking Topamax because of side effects. Camenga increased her dosage of Depakote. AR 338.

On February 6, 2005, Brunette wrote a letter to the emergency room staff at St. Mary's Hospital in Superior to advise them that plaintiff could receive treatment in the emergency room four times a month. AR 226. She indicated that plaintiff had tried multiple medications but was still having problems with severe migraine headaches.

Brunette referred plaintiff to Dr. David Black, a neurologist at the Mayo Clinic. Black conducted an evaluation of plaintiff on February 14, 2005. From plaintiff's description of her history, symptoms and treatment, Black concluded that plaintiff had "a headache history consistent with chronic migraine without aura with probable medication-overuse headache in the form of Demerol and short-lasting analgesics." AR 324. Black advised that plaintiff "absolutely must discontinue all narcotics in the next two months, and this includes Demerol." Id. He listed a number of other medication regimes that could be tried when plaintiff presented to the emergency room with a headache. If all of these alternatives failed, said Black,

> then a low dose of Demerol could be contemplated, but the bottom line would be whether or not she was still getting response to any other medication that Demerol should be at least weaned down to no more than once per month and much more preferably zero per month.

6

AR 325. Black described various non-narcotic medications that could be tried to combat plaintiff's headaches. AR 323-25. A magnetic resonance imaging scan of plaintiff's head was normal. AR 69.

On March 7, 2005, plaintiff saw Brunette for headaches and heart palpitations that plaintiff perceived to be a side effect of the Depakote, which she had since stopped taking. Brunette started plaintiff on neurontin and reviewed Black's recommendations. She advised plaintiff that she should not use Imitrex unless absolutely necessary and should try to limit narcotics as much as possible. A stress echocardiogram did not show any evidence of ischemia. AR 347.

Four days later, plaintiff reported with a migraine headache to the St. Mary's Medical Center Emergency Room, where she was given an injection of Demerol, Toradol and Phenergan. AR 308-09. She returned 17 days later, on March 28, 2005, and was "quite adamant" that she receive her usual cocktail of injections. The attending physician, Dr. Robert Okoro, noted that although he initially negotiated with plaintiff to forgo the Toradol, he later relented and administered the drug after plaintiff reported insufficient relief from the Demerol and Vistaril alone. AR 304. That emergency room visit was followed by visits on April 12 and 19; May 2, 15 and 30; and June 6, 14 and 19. On each occasion, emergency room staff treated plaintiff, sometimes reluctantly, with narcotics.

On June 29, 2005, Okoro noted that plaintiff had been coming to the emergency room on average of four times a month for migraines, insisting that she be treated with a combination of Toradol, Demerol and Vistaril. AR 444. Okoro assessed plaintiff as having chronic intractable migraines and chronic prescription narcotic overuse. He indicated that although he appreciated Brunette's efforts to treat plaintiff's headaches, plaintiff "is not best served by coming to the Emergency Room to receive narcotics four times a month." AR 446. He recommended that plaintiff be referred to the Chronic Pain Management Center in Duluth. AR 445-446. About a month later, a second emergency room physician, Dr. Maurice Murphy, agreed with Okuro's recommendation after plaintiff came again to the emergency room insisting that she be treated with Demerol for her migraine. AR 440. (Between these visits, plaintiff had gone three times to the Hayward Area Memorial Hospital emergency room, where she received narcotic injections. AR 425-36.)

In the meantime, Brunette attempted to get plaintiff's headaches under control by increasing her neurontin dosage, adding amitriptyline, AR 408-09, and then later restarting Topamax. AR 399. However, plaintiff quickly stopped the Topamax because she believed it was causing numbness in her hands and feet and difficulty voiding. AR 674.

On August 10, 2005, plaintiff saw neurologist Dr. David Thompson. Plaintiff told Thompson that the emergency room doctors would no longer give her Demerol and that her primary care physician had said that she would not treat plaintiff's headaches. AR 674. (I

8

presume that Brunette told plaintiff that she would not treat her with narcotics, for nothing in Brunette's reports suggests that she declined to provide plaintiff with any treatment for her headaches.) Thompson advised plaintiff to resume taking Topamax, indicating that the urinary retention that plaintiff had experienced was likely due to the amitriptyline that she had been taking simultaneously. He suggested that Decadron or intravenous Reglan be used in the emergency room for plaintiff's headaches. AR 675.

On August 18 and 23, 2005, plaintiff was seen in the emergency room with a headache. She was given 10 milligrams of intravenous Reglan and 100% oxygen with good results, leading medical staff to suspect that her headaches might be cluster headaches. AR 579-81. (In general, cluster headaches are more painful than migraines and occur cyclically, with a pattern of frequent attacks lasting from weeks to months followed by a remission period. Cluster headaches often respond well to oxygen. Http://www.mayoclinic.com/health/cluster-headache/DS00487) (visited March 17, 2009).) On August 24, 2005, Brunette wrote a letter stating that it was medically necessary for plaintiff to use oxygen at home as needed for severe headaches. AR 497. According to Brunette, plaintiff suffered from "severe and debilitating" headaches that came on suddenly, had not responded to medication and had required treatment in the emergency room. AR 497. Just five days later, however, plaintiff told emergency room staff that she no longer wanted to be treated with Reglan and oxygen because it had precipitated an anxiety attack.

AR 575. The physician noted that the only thing that seemed to work for plaintiff's migraines was the combination of Demerol, Vistaril and Toradol, which he administered. AR 575-76.

On September 9, 2005, plaintiff returned to see Thompson. She noted that she had been to the emergency room for her migraine headaches and reiterated her belief that the Reglan had provoked an anxiety attack. Plaintiff had again stopped taking the Topamax because of urinary retention. Thompson said that he had no new thoughts regarding treatment for plaintiff's migraines, noting that plaintiff was "seemingly resistant to all prior prophylactic medications." AR 669. He referred plaintiff to Dr. Wolcott Holt in the Headache Clinic. AR 665.

2. Records after last insured date

Plaintiff saw Holt on November 2, 2005. Holt did not think plaintiff's headaches were cluster headaches. He recommended a combination of medications for plaintiff, including a trial of Zonegran and the London Migraine Protocol, consisting of two Diazepam, four Advil and Compazine. AR 658-59, 655.

Plaintiff was treated in the pain management clinic between November 2005 and April 2006. A clinic physician noted that the program's long range goal was to "reduce and eliminate opioids and other drugs that are well known or possibly related to the medication

overuse syndrome." AR 657.  As part of her treatment program, plaintiff underwent physical therapy, occupational therapy, counseling and biofeedback.   AR 484-94, 498, 509.  On March 24, 2006, Holt noted that plaintiff's headaches were better, with less rebound.  AR 616.  At discharge from the pain clinic program in April 2006, she was noted to have high energy and was compliant with her medications.  AR 606.  Nonetheless, in 2006, plaintiff had 27 emergency room visits for headache pain.  AR 557, 555, 639, 553, 551, 536, 534, 532, 529, 524, 522, 520, 686, 724, 722, 720, 718, 715, 717, 713, 711, 703, 701, 563, 699 and 607.

On May 15, 2006, Brunette wrote a letter to the St. Mary's Hospital emergency room doctors authorizing them to treat plaintiff up to four times a month. AR 495-96.  She noted that plaintiff had been tried on multiple medications and had been compliant with her medications, but continued to have migraines that were at times severe.   Brunette recommended that plaintiff be given intravenous saline, followed by injections of Toradol and then Demerol.

B.  Consulting Physicians

On May 3, 2005, Dr. Robert T. Callear, a state agency consulting physician, completed a physical residual functional capacity assessment for plaintiff after reviewing her medical records.  He concluded that plaintiff was capable of meeting the demands of full

time work at the medium exertional level, that is, she could lift 50 pounds occasionally and 25 pounds frequently and could sit, stand or walk about six hours each in an eight hour work day.  AR 287-94.  On August 22, 2005, state agency consulting physician Dr. Pat Chan conducted a similar review and agreed that plaintiff could perform full time, medium work so long as she avoided all exposure to hazards such as machinery and heights.  AR 476-83. Neither physician provided any narrative or cited any medical evidence, but expressed his opinion by checking off boxes on a pre-printed form.  Both Callear and Chan signed Disability Determination and Transmittal Forms finding plaintiff not disabled.[1]  AR 45, 46.

## C.  Hearing Testimony

Plaintiff testified that she had suffered from migraine headaches since she was 19 years old but that they had gotten worse in approximately 2002.  AR 802.  Plaintiff testified that she had attempted to work in 2003 as an office assistant, but the job ended after six months because she was missing too many hours as a result of her headaches.  AR 799.  Her headaches, which can last for up to three days, are triggered by changes in the weather, fragrances and certain foods, such as those containing monosodium glutamate (MSG). When plaintiff has a severe headache, she puts cold packs on her neck and lies in her room

---

[1] Although the administrative law judge and the defendant's attorney refer to the state agency physicians as Pat Cohen and Norm Williams, the record indicates that the physicians' correct names are Dr. Pat Chan and Dr. Robert T. Callear.

12

with the shades drawn.  During these times, she is unable to care for her children, do housework, cook or grocery shop.  AR 808.  When she is not having a headache, she is able to function normally and complete all her chores.  AR 808-09.  Plaintiff estimated that she has debilitating headaches approximately 15 days a month.  AR 806.  When her headache becomes intolerable or has lasted for multiple days, she will go to the emergency room for an injection of Toradol, Demerol and Vistaril, which always works to end the headache.  AR 803.  She estimated that she had been treated for headaches in the emergency room with Toradol, Demerol and Vistaril injections at least once a month since December 2003 because of intolerable headache pain. AR 803.  Plaintiff's parents, husband and friends submitted letters corroborating plaintiff's testimony regarding her limitations and the frequency of her headaches.

The administrative law judge questioned plaintiff about the medical records indicating that plaintiff's problems with headaches were compounded by medication overuse.  The relevant portion of the transcript reads as follows:

> Q. And when I look through your records, the - - Mayo seemed to think, anyway, that the headaches were basically Demerol headaches.  And well, that just kind of got dropped, it seems like, when you came back to the Duluth, Superior medical care system.  Anybody ever done anything about that belief or contention.

> A.  I had talked to Dr. Black at the time.  He was the doctor I had seen at the Mayo clinic.  He - - at the time I had been going sometimes more than - - I think more than four times a month.

13

> And he said that if those visits were down to two times or less
> a month, and I still had the headaches, then he told me he did
> not believe that they were Demerol related.  And I had
> conveyed that to Dr. Brunett [phonetic].  And Dr. Brunett said
> that she did not feel that, with the frequency of the Demerol
> and the amount of Lortabs that I took, that it was Demerol
> related or narcotic induced or however.

The administrative law judge then asked a follow-up question:

> Q.  So I just wonder if that ever happened, or if anybody ever
> gave that a try, what he was suggesting?
>
> ATTY.  Judge, they did try.  They tried to – tried her on Reglan
> and Toradol, and she kept having the headaches.  They did try
> switching her to different methods.

AR 800-01.  Plaintiff testified that she had tried other treatment modalities, including taking

up to 12 tablets of Neurontin a day.  AR 801-02.

　　　A vocational expert testified that an individual who had to miss work more than three

days a month because of migraines, emergency room visits and inability to function would

not be able to do any work in the regional or national economy.  AR 810.


### D.  The Administrative Law Judge's Decision

　　　On July 24, 2007, the administrative law judge issued his decision, finding plaintiff

not disabled.  AR 37-44.  In reaching his conclusion, the administrative law judge performed

the required five-step sequential analysis.  20 C.F.R. § 404.1520.  At step one, he found that,

although plaintiff had performed some work activity after the alleged disability onset date, the work did not constitute substantial gainful activity.  AR 39.

At step two, the administrative law judge found that plaintiff had severe impairments of migraine headaches and lumbar spine disorder.  AR 39.  He also found that plaintiff's possible depression and anxiety were not severe impairments.  AR 40.  At step three, the administrative law judge found that plaintiff did not have an impairment or combination of impairments that met or medically equaled any impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1.  AR 40.

At step four, the administrative law judge assessed plaintiff's residual functional capacity.  He found that plaintiff could perform medium work but could not work around hazards such as dangerous moving machinery and unprotected heights.  AR 41.  In making this assessment, the administrative law judge considered plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms pursuant to Social Security Ruling 96-7p and 20 C.F.R. § 404.1529(c) and concluded that they were not entirely credible.  AR 41-44.  Relying on the testimony of the vocational expert, the administrative law judge found that plaintiff's residual functional capacity did not preclude her from performing her past relevant work as a sales supervisor, bookkeeper, office assistant or assistant manager, all of which were performed at either the sedentary or light exertional levels.  AR 44.  He found plaintiff not disabled.

15

OPINION

A.  <u>Standard of Review</u>

The standard by which a federal court reviews a final decision by the commissioner is well settled: the commissioner's findings of fact are "conclusive" so long as they are supported by "substantial evidence." 42 U.S.C. § 405(g).  Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971).  When reviewing the commissioner's findings under § 405(g), the court cannot reconsider facts, reweigh the evidence, decide questions of credibility or otherwise substitute its own judgment for that of the administrative law judge regarding what the outcome should be.  <u>Clifford v. Apfel</u>, 227 F.3d 863, 869 (7th Cir. 2000).  Thus, where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the commissioner.  <u>Edwards v. Sullivan</u>, 985 F.2d 334, 336 (7th Cir. 1993).  Nevertheless, the court must conduct a "critical review of the evidence" before affirming the commissioner's decision, <u>id.</u>, and the decision cannot stand if it lacks evidentiary support or "is so poorly articulated as to prevent meaningful review."  <u>Steele v. Barnhart</u>, 290 F.3d 936, 940 (7th Cir. 2002).  When the administrative law judge denies benefits, he must build a logical and accurate bridge from the evidence to his conclusion.  <u>Zurawski v. Halter</u>, 245 F.3d 881, 887 (7th Cir. 2001).

16

B.  Listings

At step three of the five-step process for evaluating disability claims, the administrative law judge must determine whether plaintiff's impairment meets or equals one of the impairments listed by the Social Security Administration.   20 C.F.R. § 404.1520(a)(4)(iii).  Plaintiff has the burden of showing that her impairments meet or medically equal a listing.  Sullivan v. Zebley, 493 U.S. 521, 530-31 (1990); Scheck v. Barnhart, 357 F.3d 697, 700 (7th Cir. 2004); Clifford, 227 F.3d at 868.  To establish an impairment or combination of impairments that match or are equivalent to a listed impairment, plaintiff must present medical findings that meet or are equal in severity to all of the criteria in a listing.  Zebley, 493 U.S. at 530-31 (citing SSR 83-19 and 20 C.F.R. § 416.926(a)).  When the plaintiff presents evidence suggesting that her impairment meets a listing, the administrative law judge should mention in his decision the specific listings he is considering and perform more than a perfunctory analysis of whether plaintiff's impairment meets or medically equals that listing.  Ribaudo v. Barnhart, 458 F.3d 580, 583 (7th Cir. 2006); Barnett v. Barnhart, 381 F.3d 664, 668 (7th Cir. 2004); Brindisi v. Barnhart, 315 F.3d 783, 786 (7th Cir. 2003).  When, however, the plaintiff fails to come forth with any evidence showing that she meets a listing, the administrative law judge need not conduct a detailed analysis and may rely on Disability Determination and Transmittal

17

Forms signed by the state agency doctors as proof that plaintiff does not meet a listing. Scheck, 357 F.3d at 700-01.

In this case, the administrative law judge did not mention the listings he considered, making only the perfunctory statement that plaintiff "did not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4." AR 40. However, plaintiff has not come forth with substantial evidence showing that she meets or medically equals a listing that the administrative law judge failed to consider. Rice v. Barnhart, 384 F.3d 363, 369 (7th Cir. 2004) (administrative law judge's failure to refer explicitly to listing does not necessitate remand). Although she points out that the state agency physicians made their assessments on the basis of an incomplete record, she fails to identify any findings in the records that the state agency examiners did not consider to support her listings argument. Indeed, plaintiff has not even proposed a specific listing that she supposedly meets or equals. Accordingly, I find no error in the administrative law judge's determination at step three.


## C. Residual Functional Capacity/Credibility

The inquiry at steps four and five of the sequential evaluation requires an assessment of the claimant's "residual functional capacity," which the commissioner has defined as "an assessment of an individual's ability to do sustained work-related physical and mental

18

activities in a work setting on a regular and continuing basis." Social Security Ruling 96-8p. "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." Id. A claimant's residual functional capacity is determined on the basis of all relevant medical and non-medical evidence, including statements from medical sources and the claimant about how her physical or mental impairment limits her ability to do basic work activities. 20 C.F.R. § 404.1545(a)(3). In making this determination, the administrative law judge must consider the degree to which the claimant's statements about her symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence in the record. 20 C.F.R. § 404.1529. (In social security parlance, this latter determination is known as a "credibility" finding, which is somewhat of a misnomer since the administrative law judge need not find the claimant is lying in order to deny her claim.) Relevant evidence for the administrative law judge to consider are the individual's daily activities; the location, duration, frequency and intensity of the individual's pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; other treatment or measures taken for relief of pain; the individual's prior work record and efforts to work; and any other factors concerning the individual's functional limitations and restrictions. 20 C.F.R. § 404.1529(c)(3); Social Security Ruling 96-7p.

19

In this case, the administrative law judge found that plaintiff retained the residual functional capacity to perform medium work that did not include working around hazards such as dangerous moving machinery or unprotected heights and that her statements to the contrary were not "entirely credible."  In reaching this conclusion, he made the following findings:

the objective evidence did not support plaintiff's assertion of disability;

the record demonstrated that plaintiff had been assessed with migraine headaches as a result of medication overuse and excessive pharmacology sensitivity;

plaintiff's treating doctors had noted that plaintiff had exhibited Demerol-demanding behavior;

plaintiff's migraines had been treated conservatively, primarily with medication trials;

plaintiff was capable of performing all of her household chores and other activities; and

plaintiff stopped working in order to be a stay-at-home mother, indicating that factors other than plaintiff's impairments had influenced her work history, and had not made significant efforts to return to work.

AR 31-32.  The administrative law judge also placed "significant weight" on the opinions from the state agency non-examining physicians who found that plaintiff could perform medium work, explaining that these physicians had gained a "longitudinal knowledge" of plaintiff's impairments as a result of having read her medical records.  AR 32.

20

Plaintiff first challenges the administrative law judge's assessment of the objective medical evidence. She contends that, in concluding that her complaints of disabling headache pain were undermined by the absence of objective medical evidence showing some neurological abnormality or other cause for the headaches, the administrative law judge committed the same error as that committed by the administrative law judge in <u>Stebbins v. Barnhart</u>, 03-C-117-C (W.D. Wis.). In that case, this court found that because "migraine headaches do not stem from a physical or chemical abnormality that can be detected by imaging techniques, laboratory tests, or physical examination," the administrative law judge erred in relying on the lack of such evidence as a reason to discount plaintiff's allegation of disabling migraine headaches. Rep. and Recc., dkt. #11, at 10-11. In addition, the administrative law judge conducted a faulty credibility evaluation and failed to discuss the opinion of plaintiff's treating physician, who opined that plaintiff's headaches were disabling. <u>Id</u>. at 15-18.

Although this case is not exactly on all fours with <u>Stebbins</u>, I agree that the administrative law judge committed similar errors in reasoning with respect to his analysis of the objective medical evidence. First, the administrative law judge impermissibly "played doctor" when he cited the absence of abnormal neurological or other physical findings as a factor detracting from plaintiff's claim that she suffers from disabling headaches. Nothing in the record suggests that neurological or other testing could confirm the presence of

21

plaintiff's headaches or their severity.  To the contrary, it appears that no test exists to confirm the diagnosis of migraine.  National Headache Foundation, Headache Topic Sheet, available at http://www.headaches.org/education/Headache_Topic_Sheets/Migraine (visited February 23, 2009).  A diagnosis of migraine headache is made when certain clinical criteria are present, including a recurrent headache that lasts from 4 to 72 hours, is throbbing, is moderate to severe in intensity, is localized to one side of the head, and is associated with nausea, vomiting or sensitivity to light, sound or smell.  Id.

In this case, it is beyond dispute that plaintiff complained consistently of these classic migraine symptoms.  Although it is true that a claimant's self-reported symptoms are insufficient by themselves to establish disability, see 20 C.F.R. § 404.1528(a), when these symptoms are documented by a physician in a clinical setting, they "are, in fact, medical signs which are associated with severe migraine headaches," and are often the only means available to prove their existence.  Ortega v. Chater, 933 F. Supp. 1071, 1075 (S.D. Fla. 1996); see also SSR 96-4p at n.2 (when a manifestation such as pain, fatigue, weakness or nervousness is "an anatomical, physiological, or psychological abnormality that can be shown by medically acceptable clinical diagnostic techniques, it represents a medical 'sign' rather than a 'symptom'").  Further, there is no evidence in the record that any treating doctor, including the various neurologists who evaluated plaintiff, questioned whether she actually had migraines or was exaggerating her symptoms.

22

Second, the administrative law judge ignored important evidence when he determined that plaintiff's headache complaints were entitled to less weight because of various reports indicating that they were exacerbated by plaintiff's overuse of narcotics.  As an initial matter, although there is no dispute that plaintiff's doctors were concerned that her use of narcotics and analgesics was contributing to her headaches (a theory supported by recent research, e.g., Peter Jaret, "A Hidden Cause of Headache Pain," Aug. 30, 2007, available at http://health.nytimes.com/ref/health/healthguide/esn-headache-ess.html), it is not clear that they thought her headaches were solely from medication overuse or would subside completely if she stopped such medications, as the administrative law judge appeared to suggest.  Notably, Black, the neurologist who first suggested that plaintiff's headaches were rebound headaches, concluded that plaintiff had *both* migraine headaches and headaches caused by medication overuse.  More important, even after Black suggested that plaintiff be weaned from all narcotics, Brunette continued to authorize such treatment, writing letters to emergency room doctors in 2005 and 2006 allowing the Demerol injections up to four times a month.  However, the administrative law judge never mentioned Brunette anywhere in his decision, even though she was plaintiff's regular treating physician and an acceptable medical source.  20 C.F.R. § 404.1513(a) (licensed osteopathic doctors are acceptable medical sources).  That plaintiff's treating physician expressly condoned the narcotic treatment that the administrative law judge criticized plaintiff for seeking was a significant

23

piece of evidence that the administrative law judge was obliged to discuss.  Herron v. Shalala,
19 F.3d 329, 333 (7th Cir. 1994) (administrative law judge may not "select and discuss only
that evidence that favors his ultimate conclusion").   This is not to suggest that the
administrative law judge was *required* to accept Brunette's opinion regarding the
appropriateness of near-weekly narcotic injections to treat plaintiff's headaches; indeed, there
are ample reasons to question the soundness of that opinion.   Nevertheless, the
administrative law judge could not simply turn a blind eye to Brunette's opinion while at the
same time criticizing plaintiff for seeking Demerol injections.

The administrative law judge committed another error in reasoning when he found
that plaintiff was treated "conservatively," primarily with medication trials.  This description
of plaintiff's treatment history is not supported by any reasonable reading of the record.
Plaintiff received injections of narcotics for headaches on a regular basis for at least two
years.  She was seen by neurologists who recommended various medication combinations
both to treat and prevent her headaches and her treating physician tried alternative
treatments including oxygen therapy.  Plaintiff's treatment in 2004 and 2005 was ongoing
and extensive.  In addition to trying numerous medications, in late 2005 and early 2006,
plaintiff attended a pain management program that had involved behavioral modification,
home exercise, cognitive behavioral therapy and biofeedback.  There is nothing in the record
to suggest that plaintiff rejected any treatment that was recommended by her physicians for

24

reasons other than side effects.   Further, contrary to the administrative law judge's suggestion, medication remains the primary method of treating headaches. Http://www.migraineresearchfoundation.org/treatment.html (visited March 18, 2009).  By concluding otherwise, he overstepped his bounds and played doctor.  Murphy v. Astrue, 496 F.3d 630, 634 (7th Cir. 2007) ("[A]n ALJ cannot play the role of doctor and interpret medical evidence when he or she is not qualified to do so.").

Sidestepping these errors, the commissioner defends the administrative law judge's decision by pointing out that in Stebbins, the plaintiff's claim that her migraines were disabling was supported by an uncontradicted opinion from her treating physician that was ignored by the administrative law judge.  By contrast, argues defendant, this case lacks an opinion from any treating physician concerning plaintiff's functional limitations or ability to work.  Therefore, defendant's argument goes, the administrative law judge was entitled to rely on the uncontradicted opinions from the state agency non-examining physicians, who found that plaintiff was capable of performing medium work.

Contrary to defendant's suggestion, a claimant need not come forward with a medical opinion that contradicts that of the state agency physicians; she need only produce contradictory *evidence*.  Ribaudo, 458 F. 3d at 584 (administrative law judge may rely on opinions of state agency physicians as long as record contains no contradictory evidence); see also SSR 96-8p (residual functional capacity determination is made upon consideration

25

of *all* relevant evidence, not just medical source statements).  Like any other opinion from an acceptable medical source, opinions from state agency consultants are not binding on the administrative law judge.  Their opinions can be given weight "only insofar as they are supported by evidence in the case record, considering such factors as the degree to which the opinion is supported by the evidence (including any evidence received at the administrative law judge and Appeals Council levels that was not before the State agency), the consistency of the opinion with the record as a whole, including other medical opinions, and any explanation for the opinion provided by the state agency consultant.  Id; see also Haynes v. Barnhart, 416 F.3d 621, 630 (7th Cir. 2005) & 20 C.F.R. § 404.1527(d) (explaining factors adjudicator must consider in weighing medical opinions).  Further, because state agency physicians do not have a treatment relationship with the claimant, their opinions are to be weighed "by stricter standards, based to a greater degree on medical evidence, qualifications, and explanations for the opinions, than are required of treating sources."  Social Security Ruling 96-6p; see also Bauer v. Astrue, 532 F.3d 606, 608 (7th Cir. 2008) (administrative law judge erred in accepting consultant's opinion over treating physicians' opinion where consultant did not identify flaw in treating physicians' analysis, "but merely expressed a contrary view after reading the medical files"; further, consultant's area of expertise was unknown).

26

In this case, plaintiff presented medical evidence from her treating doctor, several neurologists and emergency room doctors showing that she had debilitating migraine headaches that required her to lie down for several hours, or seek narcotic treatment in the emergency room as often as two or three days a week.  She also had letters from her treating physician authorizing her to receive narcotics injections in the emergency room up to four times a month.  Although it is true that Brunette never stated that plaintiff was "disabled" or "unable to work," her letters and the longitudinal medical record corroborate  plaintiff's claim that she cannot work because of frequent absenteeism, contradicting the contrary opinions of the state agency physicians.  As a result, the administrative law judge was required to weigh the state agency physicians' opinions in accordance with the commissioner's rules and regulations.

The administrative law judge's decision fails to provide any assurance that he did the required weighing.  He appears to have given no consideration to the physicians' qualifications (Callear is an internist; Chan's specialty is unknown) or more important, to the glaring lack of any explanation for their medical conclusions.  The state agency physicians never explained how they reconciled their conclusion that plaintiff is capable of performing medium work on a full time basis with the medical records that show that plaintiff was treated in the emergency room at least twice a month for debilitating headaches with her doctor's permission.  Did they think such treatment was unnecessary?  Did they

think plaintiff was exaggerating her headache pain?  Did they think plaintiff's headaches were being controlled by other medications?  Did they even consider the absenteeism issue, or were they considering only plaintiff's physical limitations?  Their boilerplate "opinions" offer no answers to these questions.  Indeed, by all indications, the state agency physicians appear to have simply signed off on the conclusions drawn by the state agency disability examiners, who are not physicians.  In a case as complex as this one, such bare-bones, rote opinions are of little value.

In addition, the record does not support the conclusion that the state agency physicians had a "longitudinal" picture of plaintiff's impairment, as the administrative law judge found.  After the state agency physicians completed their review, numerous medical records were added to the record, including Brunette's August 24, 2005 letter, noting that plaintiff suffered from severe debilitating headaches, emergency room records documenting additional visits for migraines, records from Dr. Holt and the pain clinic records.  Perhaps these additional records would have made no difference to the agency physicians' opinions, but it is impossible to know this without knowing what the agency physicians were thinking.

In sum, the state agency physicians' unexplained opinions do not provide an evidentiary backstop for the administrative law judge's other errors and omissions with respect to the objective medical evidence.  This leaves only plaintiff's daily activities and her work history.  The administrative law judge noted that in spite of her complaints of disabling

28

headaches, plaintiff was a stay-at-home mother of two children who was able to perform all household chores including cooking, cleaning, doing laundry and shopping, and who was active in her church and enjoyed quilting.  However, plaintiff testified that her parents help her care for her children (who are 8 and 10 years old) when she has a migraine and that she is able to complete chores and other activities only on days when she does not have a headache.  On days when she has a headache, she is completely out of commission and spends most of her day in bed.  (This testimony was corroborated by the various letters from plaintiff's husband, parents and friends.)  In the work world, an employer would not allow plaintiff to have several days off a week and then catch up on her good days, as plaintiff testified is her routine.  <u>Bauer</u>, 532 F.3d at 609 ("Suppose that half the time she is well enough that she could work, and half the time she is not.  Then she could not hold down a full-time job.").

That said, there is some evidence in the record that arguably supports the administrative law judge's conclusion that plaintiff's migraines are not as limiting as she asserts.  As the administrative law judge noted, in one medical report, plaintiff reported that she had been camping for three weeks with her family at a campground and had gone tubing.  Although the record indicates that plaintiff received at least one narcotic injection in the emergency room for a migraine during that trip, it is difficult to quibble with the administrative law judge's determination that camping for three weeks and tubing are facially

29

inconsistent with plaintiff's claim that she is bed-ridden with a headache roughly five of every 10 days.  It was also within reason for the administrative law judge to have expected plaintiff to have made more efforts to return to work before seeking disability benefits (although it is difficult to see how plaintiff could hold herself out to prospective employers as a reliable worker).  Nonetheless, in light of the other serious errors committed by the administrative law judge and the medical records corroborating plaintiff's claim that she has severe headaches so frequently that she cannot hold a full time job, remand is warranted.  As the court of appeals stated in Sarchet v. Chater, 78 F.3d 305, 309 (7th Cir. 1996), "[w]hen the decision of [the administrative law judge] on matters of fact is unreliable because of serious mistakes or omissions, the reviewing court must reverse unless satisfied that no reasonable trier of fact could have come to a different conclusion[.]"  I am not satisfied of that in this case.

Plaintiff urges this court to remand this case with directions that she be awarded benefits.  I decline to do so.  "[A]n award of benefits is appropriate only if all factual issues have been resolved and the record supports a finding of disability."  Briscoe ex rel. Taylor v. Barnhart, 425, F.3d 345, 356 (7th Cir. 2005).  That is not the case here.  Unresolved factual issues remain regarding the appropriateness of narcotic injections to treat plaintiff's headaches, whether plaintiff made a good faith effort to avoid such medications, whether plaintiff's headaches would be less severe or less frequent without those medications and

30

whether plaintiff's headaches occur with the frequency and severity to prevent her from working on a sustained and consistent basis.  To resolve these complex questions, I strongly encourage the administrative law judge to call as an expert a medical doctor who has expertise in the diagnosis and treatment of migraine headaches.


ORDER

IT IS ORDERED that the decision of defendant Michael Astrue, Commissioner of Social Security, denying plaintiff Sherry Lee Tyson's application for disability insurance benefits is REVERSED AND REMANDED pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

The clerk of court is directed to enter judgment for plaintiff and close the case.

Entered this 20th day of March, 2009.

BY THE COURT:

/s/

_____
BARBARA B. CRABB
District Judge